STATE of Wisconsin,
Plaintiff-Respondent,

v.

Michael A. SVEUM,
Defendant-Appellant.†

Court of Appeals

*No. 2008AP658–CR. Submitted on briefs November 12, 2008.
—Decided May 7, 2009.*

2009 WI App 81

(Also reported in 769 N.W.2d 53.)

† Petition to review granted 10/13/09.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Michael A. Sveum*.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Daniel J. O'Brien*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

Before Dykman, Lundsten and Bridge, JJ.

¶ 1. LUNDSTEN, J. Michael Sveum challenges his aggravated stalking conviction. At Sveum's jury trial, the prosecution presented detailed tracking information about the movements of Sveum's car obtained from a Global Positioning System tracking device (GPS de-

vice) that police secretly attached to his car. Sveum argues that the police obtained this tracking information in violation of his Fourth Amendment right to be free from unreasonable searches and seizures. The State responds that no Fourth Amendment search or seizure occurs when police attach a GPS device to the outside of a vehicle while it is in a place accessible to the public and then use that device to track the vehicle while it is in public view. We agree with the State. At the same time, we urge the legislature to consider regulating both police and private use of GPS tracking technology.

¶ 2. Sveum's other challenges to his conviction include whether the GPS tracking information should be suppressed under the Wisconsin Electronic Surveillance Control Law, whether a search warrant for Sveum's residence and car was valid, whether the circuit court committed error by admitting evidence of Sveum's prior stalking conviction, whether Sveum's trial counsel was ineffective, and whether an erroneous jury instruction requires a new trial. We reject all of Sveum's arguments and affirm the judgment and order.

### *Background*

¶ 3. Sveum was convicted of stalking Jamie Johnson in 1996 and was later imprisoned for related crimes against Johnson. In 1999, from prison, he began stalking Johnson again with help from his sister. Sveum continued stalking Johnson when he was released from prison in 2002. In March 2003, Johnson reported to the police that she believed Sveum was stalking her again.

¶ 4. As part of their investigation, police sought and received a warrant authorizing them to covertly attach a GPS device to Sveum's car in order to track it. Based in part on tracking information retrieved from the GPS device, the police obtained a warrant to search

one of Sveum's residences and his car.[1] The search revealed additional evidence incriminating Sveum, along with evidence confirming his sister's involvement.

¶ 5. Sveum was charged with an aggravated stalking offense under WIS. STAT. § 940.32(2) and (3)(b) (2001–02), as party to a crime.[2] The more serious "aggravated" version of the crime was charged based on Sveum's previous conviction for stalking Johnson. *See* § 940.32(3)(b). The circuit court denied motions by

---

[1] The warrant application suggests that there may have been some question as to which of two residences was Sveum's primary residence. That question is not important for purposes here, and we will generally refer to Sveum's residence without specifying which residence we mean.

[2] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted. The stalking statute under which Sveum was charged provides, in pertinent part, as follows:

(1) In this section:

(a) "Course of conduct" means a series of 2 or more acts carried out over time, however short or long, that show a continuity of purpose, including any of the following:

1. Maintaining a visual or physical proximity to the victim.

. . . .

6. Contacting the victim by telephone or causing the victim's telephone or any other person's telephone to ring repeatedly or continuously, regardless of whether a conversation ensues.

. . . .

(2) Whoever meets all of the following criteria is guilty of a Class I felony:

(a) The actor intentionally engages in a course of conduct directed at a specific person that would cause a reasonable person under the same circumstances to fear bodily injury to or the death of himself or herself or a member of his or her family or household.

(b) The actor intends that at least one of the acts that constitute the course of conduct will place the specific person in

506

Sveum to suppress evidence obtained from the GPS device and from the search of his residence and car. A jury found Sveum guilty, and the court sentenced him to seven years and six months in prison followed by five years of extended supervision. We discuss additional facts as needed below.

## Discussion

### A. Suppression Of GPS Evidence Under Fourth Amendment

¶ 6. Sveum challenges the admission of GPS tracking information showing the movements of his car. He argues that the warrant[3] authorizing police to place the GPS device on his car was overly broad. The State responds that the warrant was unnecessary because no Fourth Amendment search or seizure occurred. In

reasonable fear of bodily injury to or the death of himself or herself or a member of his or her family or household.

(c) The actor's acts induce fear in the specific person of bodily injury to or the death of himself or herself or a member of his or her family or household.

. . . .

(3) Whoever violates sub. (2) is guilty of a Class F felony if any of the following applies:

. . . .

(b) The actor has . . . a previous conviction under this section . . ., the victim of that crime is the victim of the present violation of sub. (2), and the present violation occurs within 7 years after the prior conviction.

Wis. Stat. § 940.32.

[3] Whether the court order that authorized police use of the GPS device here can technically be considered a warrant is unclear, but resolving this question is not important for purposes of our decision.

reply, Sveum implicitly concedes that placing the GPS device on his car and using it to monitor *public* travel does not implicate the Fourth Amendment. He contends, however, that because the GPS device permitted the police to monitor the location of his car while it was in his garage and in his employer's garage, places out of public view, all of the information obtained from the GPS device should have been suppressed. Because we agree with the State that no Fourth Amendment search or seizure occurred, we do not address Sveum's warrant argument.

¶ 7. We begin with a recap of the pertinent facts. The battery-powered GPS device used here periodically receives and stores location information from one or more satellites. To obtain tracking information, the device must be physically retrieved and its information downloaded to a computer. The result is a detailed history, including time information, of the device's location and, hence, the vehicle's location. While Sveum's car was in his driveway, police secretly attached the device to the underside of his car with a magnet and tape. The police tracked Sveum's car with the device for about five weeks. During this time, Sveum parked his car in his enclosed garage and inside a garage at his place of employment, a car care center.

¶ 8. We agree with the State that neither a search nor a seizure occurs when the police use a GPS device to track a vehicle while it is visible to the general public. The seminal cases on this topic are *United States v. Knotts*, 460 U.S. 276 (1983), and *United States v. Karo*, 468 U.S. 705 (1984).

¶ 9. In *Knotts*, government agents planted a "beeper"—a radio transmitter emitting periodic signals that permit tracking with a radio receiver—inside a five-gallon drum. *See Knotts*, 460 U.S. at 277–78. Using the beeper, the agents were able to track a vehicle

transporting the drum and determine that it had come to rest on the defendant's premises. *Id.* at 277–78, 282, 284–85. The Court held that the monitoring of the beeper while the vehicle was in public view did not invade any legitimate expectation of privacy and, therefore, did not constitute a search or seizure under the Fourth Amendment. *Id.* at 285. The Court reasoned that the device simply made it easier to discover what was already "voluntarily conveyed to anyone who wanted to look." *See id.* at 281–82. The Court explained:

> A person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another. When [one of the defendant's accomplices] traveled over the public streets he voluntarily conveyed to anyone who wanted to look the fact that he was traveling over particular roads in a particular direction, the fact of whatever stops he made, and the fact of his final destination when he exited from public roads onto private property.
>
> . . . [N]o . . . expectation of privacy extended to the visual observation of [the] automobile arriving on [the private] premises after leaving a public highway, nor to movements of objects such as the drum of chloroform outside the cabin in the "open fields."
>
> Visual surveillance from public places along [the] route or adjoining Knotts' premises would have sufficed to reveal all of these facts to the police.

*Id.* (citation omitted). The *Knotts* Court specifically noted that "nothing in [the] record indicates that the beeper signal was received or relied upon after it had indicated that the drum . . . had ended its automotive journey to rest on [defendant]'s premises." *Id.* at 284–85. Similarly, "there [was] no indication that the beeper was used in any way to reveal information as to the movement of the drum within the [premises], or in

any way that would not have been visible to the naked eye from outside the cabin." *Id.* at 285. Thus, the Court concluded, the Fourth Amendment was not implicated. *Id.*

¶ 10. In contrast, a year later in *Karo*, the Court concluded that when police used a similar beeper planted in a similar container to determine how long the container remained at certain locations and to reveal the specific location of the container within a storage facility, a Fourth Amendment search occurred. *See Karo*, 468 U.S. at 708–10, 717–18 & n.5. The *Karo* Court explained that the government used the device to obtain "information that it could not have obtained by observation from outside the curtilage of the house." *See id.* at 715–16.

¶ 11. *Knotts* and *Karo* teach that, to the extent a tracking device reveals vehicle travel information visible to the general public, and thus obtainable by warrantless visual surveillance, the use of the device does not normally implicate Fourth Amendment protections. It follows that no Fourth Amendment violation occurred here simply because the police used a GPS device to obtain information about Sveum's car that was visible to the general public.

■

¶ 12. We also agree with the State that the police action of attaching the GPS device to Sveum's car, either by itself or in combination with subsequent tracking, does not constitute a search or seizure.[4] The State aptly relies on *United States v. Garcia*, 474 F.3d 994 (7th Cir. 2007).

---

[4] In *United States v. Knotts*, 460 U.S. 276 (1983), the Supreme Court did not address the issue because the defendant there believed he lacked standing to challenge the placement of the "beeper." *Id.* at 279 n.*.

¶ 13. The *Garcia* court concluded that attaching a GPS device to a car while the car was in a public place did not convert the subsequent tracking into a Fourth Amendment search. *See id.* at 996–98. The court reasoned:

[I]f police follow a car around, or observe its route by means of cameras mounted on lampposts or of satellite imaging as in Google Earth, there is no search. Well, but the tracking in this case *was* by satellite. Instead of transmitting images, the satellite transmitted geophysical coordinates. The only difference is that in the imaging case nothing touches the vehicle, while in the case at hand the tracking device does. But it is a distinction without any practical difference.

*Id.* at 997. Like the Seventh Circuit, we discern no privacy interest protected by the Fourth Amendment that is invaded when police attach a GPS device to the outside of a vehicle, as long as the information obtained is the same as could be gained by the use of other techniques that do not require a warrant.

¶ 14. Sveum might respond that, unlike *Garcia*, the police here did not attach the GPS device while his car was parked in a public place. However, the circuit court concluded that Sveum's driveway was not constitutionally protected "curtilage," and Sveum does not challenge this ruling or otherwise present a developed argument as to why the police engaged in a search or seizure by entering his driveway.

¶ 15. Accordingly, we follow *Garcia*'s lead and conclude that the attachment of a GPS device to Sveum's car does not change our view that, under *Knotts* and *Karo*, no Fourth Amendment search or seizure occurred here.
■

¶ 16. Sveum argues that all of the tracking information should be suppressed because the GPS device

monitored the location of his car when it was out of public view. We reject this argument for two reasons.

¶ 17. First, although the police presumably obtained location information while Sveum's car was inside areas not open to surveillance, there is no indication that this same information could not have been obtained by visual surveillance from outside these enclosures. Such surveillance could have told the police when Sveum's car entered or exited his garage and the garage at his workplace and, therefore, informed them when his car remained in those places. Sveum does not argue that the police used the GPS device to track his car's movements *within* the enclosures.

¶ 18. Second, even if the police had obtained some information about the movement of Sveum's car within the enclosures and this information should have been suppressed, Sveum suggests no reason why *all* of the tracking information should be suppressed. Although we need not exhaustively analyze this issue, we note that properly obtained evidence is generally not excluded simply because a search is illegally extended to improperly obtain evidence. *See State v. Noll*, 116 Wis. 2d 443, 454–55, 343 N.W.2d 391 (1984) ("Insofar as the searcher exceeds the scope of the validly authorized search, items so seized must be suppressed. However, as to those items discovered in the lawful execution of the valid part of the warrant, the Fourth Amendment does not require suppression."). Similarly, properly obtained and incriminating wiretap information is not suppressed solely because police also overhear unrelated private conversations that they would otherwise have no right to overhear.[5] It is not apparent why a balancing of interests should not pro-

---

[5] We are aware of no constitutional rule that requires suppression of incriminating conversations obtained by an

duce the same rule when applied to the GPS tracking situation here.

■

¶ 19. Accordingly, we conclude that no Fourth Amendment search or seizure occurs when police attach a GPS device to the outside of a vehicle while it is in a place accessible to the public and then use that device to track the vehicle while it is in public view. Because this case does not involve tracking information on the movement of Sveum's car within a place protected by the Fourth Amendment, it follows that the circuit court correctly rejected Sveum's Fourth Amendment suppression argument.

¶ 20. We are more than a little troubled by the conclusion that no Fourth Amendment search or seizure occurs when police use a GPS or similar device as they have here. So far as we can tell, existing law does not limit the government's use of tracking devices to investigations of legitimate criminal suspects. If there is no Fourth Amendment search or seizure, police are seemingly free to secretly track *anyone's* public movements with a GPS device. As the Seventh Circuit observed:

authorized wiretap solely because the wiretap also captures private conversations in which the government has no legitimate interest and could not otherwise intercept. We note, however, that federal and Wisconsin law require that authorities "minimize" the interception of the latter category of conversations. *See Scott v. United States*, 436 U.S. 128, 140 (1978) ("[18 U.S.C. § 2518(5)] does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations."); Wis. Stat. § 968.30(5) (2007–08) (Wisconsin's counterpart to the federal minimization statute).

The new technologies enable, as the old (because of expense) do not, wholesale surveillance. One can imagine the police affixing GPS tracking devices to thousands of cars at random, recovering the devices, and using digital search techniques to identify suspicious driving patterns. One can even imagine a law requiring all new cars to come equipped with the device so that the government can keep track of all vehicular movement in the United States . . . .

. . . .

Technological progress poses a threat to privacy by enabling an extent of surveillance that in earlier times would have been prohibitively expensive.

*Garcia*, 474 F.3d at 998.

¶ 21. We are also concerned about the private use of GPS surveillance devices. As the Seventh Circuit and a recent *New York Times* article indicate, GPS technology is available at low cost to the general public. *See Garcia*, 474 F.3d at 995; David Pogue, *Peekaboo, Zoombak Sees You,* N.Y. TIMES, Apr. 23, 2009, at B1, B8. Although there are obviously legitimate private uses, such as a trucking company monitoring the location of its trucks, there are also many private uses that most reasonable people would agree should be prohibited.[6]

---

[6] In the stalking context, the "course of conduct" element can now be satisfied with evidence that a defendant used "electronic means" to monitor or record the activities of the victim. WIS. STAT. § 940.32(1)(a)6m. (2007–08). But that conduct alone is not prohibited. There must also be proof, among other elements, that the course of conduct would cause a reasonable person to suffer emotional distress or fear harm. WIS. STAT. § 940.32(2) (2007–08). Thus, using a GPS device to secretly monitor someone, without more, is not prohibited by the stalking statute.

¶ 22. Consequently, we urge the legislature to explore imposing limitations on the use of GPS and similar devices by both government and private actors. Such limitations would appear to be consistent with limitations the legislature has placed on electronic intercepts of communications. *See* Wisconsin's Electronic Surveillance Control Law, Wis. Stat. §§ 968.27–.33 (2007–08).[7]

### B. Suppression Of GPS Evidence Under Electronic Surveillance Control Law

¶ 23. As we have seen, the GPS device used here recorded location information that was downloaded from the device after it was retrieved from Sveum's car. The device did not emit a signal permitting the police to contemporaneously track Sveum's car. It is this aspect of the GPS device that prompts Sveum to challenge its use under Wisconsin's Electronic Surveillance Control Law, Wis. Stat. §§ 968.27–.33.

¶ 24. The Electronic Surveillance Control Law governs the lawfulness and uses of intercepts of "wire, electronic or oral communications." *See* Wis. Stat. §§ 968.28–.31. The law governs the in-court disclosure of the contents of intercepts of "electronic communications." *See* Wis. Stat. § 968.29; *State v. Gilmore*, 201 Wis. 2d 820, 825, 549 N.W.2d 401 (1996) ("Wisconsin Stat. § 968.29 states the conditions under which disclosure is authorized.").

¶ 25. Sveum argues that the GPS evidence here was obtained from "electronic communication[s]" covered by the Electronic Surveillance Control Law and

---

[7] All references to Wisconsin's Electronic Surveillance Control Law, Wis. Stat. §§ 968.27–.33, are to the 2007–08 version.

should have been suppressed because of noncompliance with several provisions in the law. The threshold question is whether the GPS device used to track Sveum's car produced covered electronic communications or, instead, is excluded from the law's coverage because it is a "tracking device" under WIS. STAT. § 968.27(4)(d). This threshold question involves the application of a statute to undisputed facts, a question of law that we review *de novo*. *State v. Wilke*, 152 Wis. 2d 243, 247, 448 N.W.2d 13 (Ct. App. 1989). We give statutory language its common, ordinary, and accepted meaning, except that technical or specially defined words or phrases are given their technical or special definitional meaning. *State ex rel. Kalal v. Circuit Court for Dane County*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110. Also, we must construe statutes to avoid absurd or unreasonable results. *Id.*, ¶ 46.

██

¶ 26. As Sveum acknowledges, the Electronic Surveillance Control Law expressly excludes from the definition of "electronic communication" those communications from tracking devices. WISCONSIN STAT. § 968.27(4)(d) provides, in pertinent part:

> "Electronic communication" does not include any of the following:
>
> . . . .
>
> (d) Any communication from a tracking device.

"[T]racking device" is not defined in the statute, but we agree with the State that the GPS device here is such a device because, so far as the record discloses, its sole function was to track the location of Sveum's car.

¶ 27. Our Electronic Surveillance Control Law is modeled on a federal act, and Sveum asserts that the

"statutory history" of the federal act defines a tracking device as a communication device that "emits a signal" that can be received by special tracking equipment to trace location. Sveum argues that the GPS device here is not a "tracking device" because it does not emit any signal. Rather, it receives signals and stores data that can be retrieved later. We are not persuaded.

¶ 28. Sveum provides only a record citation for his "statutory history" argument, and it leaves unclear what legal authority he is relying on. Our research, based on the limited information referenced in the record, suggests that Sveum is relying on a Senate Report that accompanied the 1986 update to the federal act. The Report includes a preliminary "glossary," which defines "electronic tracking devices (transponders)" as Sveum's argument indicates. *See* S. REP. No. 99–541, at *10 (1986). Sveum's reliance on this Senate Report, however, runs headlong into the express language of the enacted federal law, which broadly defines a "tracking device" as "an electronic or mechanical device which permits the tracking of the movement of a person or object." *See* 18 U.S.C.S. § 2510(12)(D) (incorporating the definition in 18 U.S.C.S. § 3117). Indeed, the Senate Report, in its "section-by-section" analysis of the act, references the *same definition that appears in the* enacted statutes. *See* S. REP. No. 99–541, at *33–34. Sveum does not explain why the "glossary" definition in the Senate Report should control over this plain-language statutory definition, which obviously covers the GPS device used here. Regardless whether it emitted a signal, the GPS device enabled the police to track, after the fact, the movements of Sveum's car.

¶ 29. Sveum also points out that the tracking device exception in our Electronic Surveillance Control Law refers to "[a]ny communication *from* a tracking

517

device." WIS. STAT. § 968.27(4)(d) (emphasis added). He argues that this phrasing shows that the exception applies only to devices that emit some sort of signal, not to a device like a GPS device that only receives and records data for access at a later time. Sveum's argument, however, erroneously assumes that the communication "from" the device must be simultaneous with the tracked movement. But the statutory language imposes no such requirement. Although obtained later, the information did indeed come "from" the tracking device.

██ ██

¶ 30. Moreover, the distinction Sveum suggests is not reasonable. It is not rational to limit the admission of tracking information based on whether it is obtained in real time by a signal or at a later time by direct access to the device. Thus, Sveum's interpretation of the statute would lead to unreasonable results.

## C. Search Warrant For Sveum's Residence And Car

¶ 31. Sveum divides his challenge to the search warrant for his residence and his car into two categories. First, he argues that the warrant application lacked probable cause. Second, he argues that the warrant did not describe the items to be seized with sufficient particularity. We address each in turn.

### 1. Probable Cause

¶ 32. Our duty on review is limited to ensuring that the warrant-issuing judge had a substantial basis for concluding that probable cause existed. *State v. DeSmidt*, 155 Wis. 2d 119, 133, 454 N.W.2d 780 (1990). We accord great deference to the judge's probable cause

determination; that determination will stand unless the defendant establishes that the facts are clearly insufficient to support a finding of probable cause. *State v. Higginbotham*, 162 Wis. 2d 978, 989, 471 N.W.2d 24 (1991).

¶ 33. Sveum argues that there was insufficient probable cause for the warrant to authorize seizure of the following items: journals, calendars, logs documenting travel or appointments, binoculars, flashlights, ski masks, documents mentioning Johnson and certain other individuals, and personal information related to Johnson or her family.

¶ 34. Sveum concedes that the warrant affidavit established that he used or kept many such items in connection with his 1996 stalking conviction, but asserts that the application did not provide probable cause to believe that he was keeping such items in 2003.[8] We disagree.

¶ 35. The warrant affidavit stated that the affiant was a detective with twenty-two years of experience who had specialized training in stalking crimes. *See State v. Multaler*, 2002 WI 35, ¶ 43, 252 Wis. 2d 54, 643 N.W.2d 437 (experience and special knowledge of police officers who are applying for search warrant are facts that warrant-issuing judge may consider). The detective explained in the affidavit that, based on her training and experience, individuals who engage in stalking behavior often display an obsessive personality and exhibit a pattern of conduct, including maintaining visual proximity to the victim, contacting the victim, and keeping records, journals, or other documents

---

[8] The complaint states that Sveum's 2003 charge for stalking covered conduct from 1999 through 2003 but, for ease of discussion, we refer to Sveum's conduct only by reference to 2003.

memorializing their stalking behavior. Also, such individuals often keep evidence of their obsession with the victim, including records, journals, diaries, calendars of the victim's activities or the activities of other family members, personal information, or computer records.

¶ 36. The affidavit also indicated that the affiant had investigated Sveum's prior stalking crime, and it detailed the many ways that Sveum's conduct surrounding the 1996 conviction was consistent with behaviors characteristically exhibited by individuals who stalk. In particular, Sveum at that time kept calendars marking down anniversary dates of his time with Johnson, tracked the mileage on Johnson's car, documented Johnson's whereabouts, and retained "keepsakes," including earrings, underwear, and a duplicate driver's license of Johnson's. The affidavit also outlined the evidence establishing that Sveum was again stalking Johnson in 2003.

¶ 37. When we consider all of the information in the warrant affidavit, we conclude that the affidavit established probable cause to believe that the items enumerated could be evidence of Sveum's 2003 stalking crime.

¶ 38. Sveum argues that the warrant should not have allowed police to seize computer equipment because the warrant affidavit lacked specific facts to show that a computer may have contained evidence of stalking. He asserts that nothing in the affidavit shows that he used a computer in the 1996 stalking. We are not persuaded. It is readily inferable from the warrant affidavit that Sveum's past stalking conduct involved obsessively detailed logging, calendaring, and tracking of information relating to Johnson. Given this inference, along with the increasing prevalence of comput-

erized information and personal computing between 1996 and 2003, the warrant-issuing judge could have reasonably inferred that Sveum may have been using a computer in connection with stalking Johnson in 2003 even if he had not used a computer to stalk Johnson in 1996. *See State v. Benoit*, 83 Wis. 2d 389, 399, 265 N.W.2d 298 (1978) (warrant judge may draw reasonable inferences from the evidence presented in the affidavit).

## 2. Particularity

¶ 39. Sveum argues that the warrant failed to describe the items sought with sufficient particularity. Under the Fourth Amendment, a warrant must "particularly describ[e] the place to be searched, and the persons or things to be seized." Our supreme court has recognized that, in practice, this means that a warrant should describe items to be seized "with as much particularity and specificity as the circumstances and the nature of activity under investigation permit[]." *See State v. Petrone*, 161 Wis. 2d 530, 541, 468 N.W.2d 676 (1991).

¶ 40. Sveum's particularity argument is that the many items authorized for seizure were so "nonspecific" that the warrant was an invalid general warrant. Police were authorized to seize phone bills, journals, calendars, logs, computers and devices related to computers, cameras and film, binoculars, flashlights, ski masks, audio and/or video recording equipment in any format, and evidence that might identify the residents of the searched dwelling. Sveum also argues that the warrant lacked probable cause to seize some of the types of items identified in the warrant because he and his mother occupied the residence and the warrant lacked objective standards by which the executing officers could differentiate items his mother owned. We

reject Sveum's arguments. We perceive no reason, at least in this case, why guidelines would have been helpful or necessary. Tellingly, Sveum does not suggest what sorts of ownership guidelines would have been required to satisfy his view of the particularity requirement. We conclude that the warrant described the items to be seized with as much particularity and specificity as the circumstances and the nature of Sveum's alleged stalking activity permitted.

¶ 41. Furthermore, the two cases on which Sveum places primary reliance actually cut against him. In *People v. Prall*, 145 N.E. 610 (Ill. 1924), the authorities could have, but did not, describe the stolen property sought with precision by reference to serial numbers. *See id.* at 612. No similar identifying information could have assisted in limiting the seizures here.

¶ 42. Sveum's reliance on *United States v. Klein*, 565 F.2d 183 (1st Cir. 1977), is similarly misplaced. *Klein* involved whether the description, "pirate reproduction," sufficiently informed the officers executing a warrant how to distinguish between pirated and non-pirated merchandise. *See id.* at 184–87. But that case makes plain the court's view that differentiating between the two types of merchandise was a technical endeavor based on criteria that would not generally have been known to the police officers executing the warrant. *See id.* at 186 & n.5, 188–89.[9]

---

[9] Sveum also argues that the officers exceeded the scope of the warrant when they seized financial documents. Sveum does not, however, indicate what types of financial documents he is talking about or explain why such documents fell outside the scope of the warrant. Accordingly, we consider this argument no further. *See State v. Pettit*, 171 Wis. 2d 627, 646–47, 492 N.W.2d 633 (Ct. App. 1992) (we need not consider arguments that are inadequately briefed).

## D. Evidence Of Prior Stalking Conviction

¶ 43. Sveum was convicted of aggravated stalking based on his 1996 stalking conviction. Proof of this particular aggravated stalking crime requires proof of a previous conviction for a violent .crime or a stalking crime involving the same victim pursuant to Wis. Stat. § 940.32(3)(b). Sveum argues that the circuit court erred by admitting evidence of his prior stalking conviction after he had agreed to stipulate to the conviction. The legal basis for Sveum's argument is difficult to discern, but he relies on *State v. Alexander*, 214 Wis. 2d 628, 571 N.W.2d 662 (1997), a case holding that a defendant's prior drunk driving convictions should not have gone to the jury, even though proof of the prior convictions was necessary to prove the drunk driving charge at issue in that case. Whatever persuasive value *Alexander* may have had in a stalking case was put to rest in *State v. Warbelton*, 2009 WI 6, ¶ 40, 315 Wis. 2d 253, 759 N.W.2d 557. In *Warbelton*, also a stalking case, the court expressly declined to apply *Alexander* and held that *Alexander* applies only to drunk driving prosecutions. *Warbelton*, 2009 WI 6, ¶¶ 3, 46, 61. We are bound by *Warbelton*.

## E. Ineffective Assistance Of Trial Counsel

¶ 44. Sveum argues that he received ineffective assistance of trial counsel in several respects. The two-pronged deficient performance/prejudice test we apply to such claims is well established and we do not repeat it in further detail here. We address each of Sveum's ineffective assistance claims in the sections that follow.

### 1. Jury Selection

¶ 45. Sveum argues that counsel was ineffective during jury selection by failing to ask potential jurors whether knowledge of Sveum's prior conviction for stalking Johnson would prevent them from being fair and impartial. It appears that Sveum has not demonstrated either deficient performance or prejudice, but we will limit our discussion to his failure to show prejudice.

¶ 46. Sveum's prejudice argument consists only of the speculative assertion that "due to counsel's deficiency, *there is no assurance* that Sveum's . . . right to an impartial jury was honored" (emphasis added). In the face of the same argument in the context of a sexual assault charge, we explained that the defendant "needed to show that if his trial counsel had asked more or better questions, those questions would have resulted in the discovery of bias on the part of at least one of the jurors who actually decided his case." *State v. Koller*, 2001 WI App 253, ¶¶ 11–16, 248 Wis. 2d 259, 635 N.W.2d 838. As in *Koller*, Sveum makes no such showing.

### 2. Evidence Of Pending Appeal

¶ 47. At the time of Sveum's trial in this case in 2006, an appeal from a denial of a writ of habeas corpus attacking his 1996 conviction was pending. Sveum points to language in Wis. Stat. § 906.09(5) (2005–06), which provides that "[e]vidence of the pendency of an appeal is admissible," and argues that his trial counsel was ineffective because counsel failed to introduce evidence of his pending appeal.

¶ 48. The State responds that, because the pending appeal was not a direct appeal but a collateral challenge after Sveum's direct appeal failed, the pending appeal was not an "appeal" within the meaning of WIS. STAT. § 906.09(5) (2005–06). We need not address this argument because, regardless of the proper interpretation of the statute, Sveum has not demonstrated deficient performance or prejudice. We agree with the State's alternative argument that it would have been a reasonable strategic choice by counsel not to introduce evidence of the pending challenge to Sveum's 1996 conviction because the prosecutor would have countered with damaging proof that Sveum's direct appeal from the 1996 conviction had failed.

### 3. Cross-Examination Of The Alleged Stalking Victim

¶ 49. At trial, Johnson, the stalking victim, provided strong testimony against Sveum, such as her assertion that, during one encounter in 1994, Sveum grabbed her and told her that one day when she came home he would be hiding in the bushes and would blow her head off. Sveum argues that it was, therefore, critical to impeach Johnson's credibility and that his counsel rendered ineffective assistance when counsel failed to use information Sveum provided to cross-examine Johnson. For example, Sveum says he advised his counsel about police reports proving that Johnson had voluntary contacts with him after the alleged threat, and that counsel failed to use this information to impeach Johnson.

¶ 50. We have examined each cross-examination failure Sveum alleges, and conclude that he has failed to show ineffective assistance. For example, we agree that

if Johnson had voluntary contact with Sveum after the alleged death threat, such contact might lead a jury to think it less likely that the threat occurred. Sveum cites *State v. Thiel*, 2003 WI 111, ¶ 64, 264 Wis. 2d 571, 665 N.W.2d 305, to support this common-sense observation. But, just as the *Thiel* court concluded that the failure to use such information to impeach the victim, standing alone, did not undermine the court's confidence in the outcome, *see id.*, ¶ 81, we similarly conclude that the failure does not undermine our confidence in the jury's verdict here.

¶ 51. We agree with the circuit court that, given the long history of Sveum's stalking conduct toward Johnson, attempts to impeach Johnson as Sveum suggests could easily have backfired. Moreover, much of the information Sveum relies on could have been readily explainable, and none of it would have been likely to have destroyed Johnson's credibility or made her seem less credible than Sveum. Sveum chose not to testify and, even assuming he had, it strains credulity to think the jury would have found him more credible than Johnson. The evidence at trial, which included Sveum's sister's testimony and correspondence between Sveum and his sister, showed that Sveum was highly deceptive and manipulative. Accordingly, Sveum has not shown deficient performance or prejudice based on counsel's failure to cross-examine Johnson with the information identified.

### 4. Failure To Object During Sveum's Sister's Testimony

¶ 52. Under cross-examination, Sveum's counsel elicited testimony from Sveum's sister, Renee, that she knew Sveum well and would not have helped Sveum if

she thought he would harm Johnson. On redirect, the State asked Renee if she knew that Sveum had threatened to blow Johnson's head off, and Renee replied, "no." Sveum argues that, because Renee was the first witness to testify and Johnson had not yet testified about Sveum's threat, counsel was ineffective by failing to object for lack of foundation. This argument is meritless. Although it appears to be true that the question lacked a foundation when asked because Johnson had yet to testify, we agree with the State that the same question could have been posed to Sveum's sister either by recalling her after Johnson testified or by permitting the question in hypothetical form because it was known that Johnson would testify about the death threat.

### 5. Failure To Request Limiting Instruction On Other Acts Evidence

¶ 53. The prosecutor presented evidence of Sveum's 1996 conviction for stalking Johnson and Sveum's behavior underlying that conviction. This evidence included Johnson's testimony that, among other things, Sveum went into Johnson's car and removed items, had a key made when Johnson got a different car, and left phone messages saying that Johnson would "be sorry" if she did not pick up the phone. Sveum asserts that this was "other acts" evidence and that his counsel should have requested a limiting instruction explaining to the jury that this evidence could not be used to infer that he had a propensity to commit this type of crime.

¶ 54. Sveum does not explain why a limiting instruction would likely have made a difference in the verdict in light of the types of concerns associated with other acts evidence. Rather, his argument seems to be

that counsel's failure to request a limiting instruction was *per se* deficient performance and resulted in *per se* prejudice. We disagree.

██

¶ 55. WISCONSIN STAT. § 901.06 (2005–06) provides: "When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the judge, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly." Thus, this statute requires an instruction when one is *requested*. The logical corollary is that an instruction is not required every time evidence is admitted for one purpose, but is not admissible for another, and, therefore, it is not *per se* deficient performance to fail to request an instruction.

¶ 56. Sveum also asserts that counsel's failure to request a limiting instruction implicates double jeopardy, the statute of limitations, due process, and equal protection. We agree with the State that these arguments are insufficiently developed and, therefore, address them no further. *See State v. Pettit*, 171 Wis. 2d 627, 646–47, 492 N.W.2d 633 (Ct. App. 1992) (we need not consider arguments that are inadequately briefed).

### *F. Erroneous Jury Instruction*

¶ 57. The parties agree that the jury instruction on one element of stalking, under WIS. STAT. § 940.32(3), was partially incorrect. Specifically, as to the "course of conduct" element, the jury was instructed that the acts constituting a "course of conduct" are limited to:

1) "maintaining visual or physical proximity to Jamie Johnson," or

2) "contacting Jamie Johnson by telephone or causing Jamie Johnson's telephone or any other person's telephone to ring repeatedly or continuously regardless of whether a conversation ensues," or

3) "causing any person to engage in either of the acts described [above]."

The causing-any-person part of this instruction was incorrect because of its reference to the two acts described in items 1) and 2). The "causing any person" alternative did not, at the relevant time, include causing these two acts. *See* § 940.32(1)(a) (2001–02). Thus, the jury was erroneously told that the "course of conduct" element could be met if Sveum *caused his sister Renee* to engage in either of these acts.[10]

¶ 58. Sveum correctly argues that this type of instructional error was cause for reversal in United States Supreme Court cases as recent as *Boyde v. California,* 494 U.S. 370 (1990). Since *Boyde,* however, the Court has concluded that harmless error analysis applies to such error. *Hedgpeth v. Pulido,* 129 S. Ct. 530, 532 (2008). We agree with the State that the error here was harmless.

¶ 59. For purposes of our harmless error discussion, we will assume without deciding that Sveum is correct that the proper harmless error test is the one set forth in *State v. Dyess,* 124 Wis. 2d 525, 370 N.W.2d 222 (1985). Under *Dyess,* the State must establish that there is "no reasonable possibility that the error contributed to the conviction." *Id.* at 543. Sveum argues that the test is not met here because it is impossible to

---

[10] In a subsequent version of the statute, the causing-any-person alternative applies to all of the other types of acts listed, including the two listed in Sveum's jury instruction. *See* WIS. STAT. § 940.32(1)(a) (2003–04).

know whether one or more of the jurors voted to convict him relying solely on evidence that he caused his sister to engage in stalking conduct. We are confident that did not occur.

¶ 60. The jury heard evidence that Sveum's sister maintained proximity to Johnson or made prohibited phone contacts to Johnson at Sveum's behest while he was in prison. But the jury also heard essentially uncontested evidence that, soon after Sveum was released from electronic monitoring, he began making hang-up calls to Johnson, often immediately after she arrived home. This evidence demonstrated not only that Sveum was engaging in prohibited phone contacts, but that he was also maintaining visual or physical proximity to Johnson on a recurring basis. Moreover, with exceptions not relevant here, Sveum's trial counsel did not attempt to persuade the jury that Sveum did not engage in the conduct alleged after he was released from prison. Rather, counsel disputed other elements. Counsel candidly stated in closing argument: "[Y]ou're asked to take a course of conduct *which obviously is present* and still decide if what happened here is stalking." (Emphasis added.) Counsel continued: "The course of conduct is present but you're being asked to decide if the other elements of the crime are also present . . . ."

¶ 61. We perceive no reason why any juror would have rejected evidence of Sveum's post-incarceration behavior and relied instead only on his sister's conduct. Accordingly, we conclude that the instructional error was harmless.[11]

---

[11] We note that, consistent with Sveum's charge, the jury was given the party-to-a-crime instruction. Sveum argues that

## *Conclusion*

¶ 62. For all of the reasons stated above, we affirm the judgment of conviction and the order denying postconviction relief.

*By the Court.*—Judgment and order affirmed.

this instruction "compounded" the error because applying the party-to-a-crime statute to the stalking statute would render WIS. STAT. § 940.32(1)(a)10. superfluous. Sveum does not develop this argument until his reply brief, and even then he does not address case law setting forth the standards for determining whether the party-to-a-crime statute applies. *See, e.g., State v. Tronca,* 84 Wis. 2d 68, 84–85, 267 N.W.2d 216 (1978); *State v. Curbello-Rodriguez,* 119 Wis. 2d 414, 432–33, 351 N.W.2d 758 (Ct. App. 1984). Accordingly, we decline to address this topic further. *See Pettit,* 171 Wis. 2d at 646–47.